807 A.2d 1176

**Dale LUCAS, Individually, etc.,**

**v.**

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY, et al.**

**No. 156, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 26, 2002.

210

212

G. Scott Barhight (Jennifer R. Busse and Whiteford, Taylor & Preston LLP, on the brief) Towson, for appellant.

Peter Max Zimmerman (Carole S. Demilio, on the brief for appellee, People's Counsel) Towson, for appellees.

G. Macy Nelson, Towson, for other appellee.

Argued before DAVIS, KENNEY, and RAYMOND G. THIEME, JR. (Ret'd, specially assigned), JJ.

KENNEY, J.

This case involves a petition filed by Edgar Lucas,[1] for a special exception pursuant to the Baltimore County Zoning Regulations ("BCZR")for an airport. Dale Lucas (the "appellant") appeals the Circuit Court for Baltimore County's decision affirming a determination by the Baltimore County Board of Appeals (the "Board") that the proposed use did not meet the definition of an airport.[2] He presents the following questions for our review:[3]

---

1. Edgar Lucas, the original petitioner, died on January 30, 1999, while the case was before the Baltimore County Board of Appeals (the "Board"). In April 1999, Dale Lucas, Edgar's personal representative, was substituted as the petitioner.

2. Appellees/protestants in this case include: People's Counsel of Baltimore County ("People's Counsel"); the Valley Planning Council c/o Jack Dillon, Executive Director; Deirdre Smith, Brooklandville, Maryland; Douglas Carroll, Lutherville, Maryland, owner of property located two parcels west of Helmore Farm; Susan and Stephan Immelt, Brooklandville, Maryland, owners of two parcels situated west of the Helmore Farm and one parcel, owned by Susan Immelt, individually, which borders the Helmore Farm helicopter landing area; and William Brewster, Brooklandville, Maryland, owner of property south of Helmore Farm and Hillside Road.

3. Appellee People's Counsel for Baltimore County, reformulated and condensed appellant's questions as follows:
 1. Whether the [Board's] finding that the proposed use is impermissible is correct, or at least, reasonable and deserving of deference?

I. Whether the Board erred as a matter of law in finding that the proposed use at Helmore Farm is not an "airport."

II. Whether the Board erred as a matter of law in ruling that the BCZR definition of "airport" does not include helicopter operations.

III. Whether the Board erred as a matter of law by utilizing an incorrect interpretation of the Special Exception Standard.

IV. Whether the Board erred as a matter of law by incorrectly analyzing the Special Exception Requirements of BCZR § 502.1.

We answer "no" to question I and affirm the judgment of the circuit court. We address the remaining questions in the interest of completeness.

## I. Factual and Procedural Background

The Lucas property ("Helmore Farm") is in the Greenspring Valley area of Baltimore County, which borders Baltimore City. It is bordered by Greenspring Valley Road to the north, Hillside Valley Road to the south, Falls Road to the east, and the property of appellee Susan Immelt to the west. The property is located north of the intersection of I–83 and the Baltimore Beltway.

Helmore Farm is an eighty-seven-acre tract on which thoroughbred horses are bred, raised, and trained. In addition, the farm acts as a quasi-hospital where thoroughbred horses are "laid up" during their rehabilitation process. On the property are two primary residences, several tenant dwellings, stables, and outbuildings. It is located within a National

---

2. Whether the [Board's] denial of the special exception in any event was supported by the facts and based on the relevant legal standard? The other appellees presented the questions as follows:

1. Did the Board err either in its interpretation of the Baltimore County Zoning Regulations restrictions on aircraft landing uses or in its application of those restrictions to the facts of this case?

2. Did the Board apply the *Schultz v. Pritts* test reasonably, and have the Appellants establish that they would have prevailed below if the Board had applied their version of the test to the facts it found?

Register Historic District and participates in Baltimore County's agricultural preservation program.

Helmore Farm, for the most part, is zoned "Resource Conservation—Agriculture," the R.C. 2 zone.[1] The purpose of an R.C. 2 district is "to foster conditions favorable to a continued agricultural use of the productive agricultural areas of Baltimore County by preventing incompatible forms and degrees of urban uses."[5] BCZR 1A01.1B.

Aircraft have operated,[6] in connection with the thoroughbred business, in and out of Helmore Farm since 1956. In 1997, Edgar Lucas constructed a helicopter landing pad, in a fenced-in area, on the southwestern edge of the property, approximately twenty-three feet from the property of appellee Susan Immelt. The helicopter landing site also included a windsock, perimeter lights, a guidance beam, and an all-weather observation system. The landing pad is partially

---

4. A portion of the property, near the Hillside Valley Road area, is zoned R.C. 5.

5. The current BCZR includes the following Resource Conservation ("R.C.") zones:

 R.C. 2—Resource Conservation—Agriculture **[Bill No. 98–1975]**
 R.C. 3—Resource Conservation—Deferral of Planning and Development **[Bill No. 98–1975]**
 R.C. 4—Resource Conservation—Watershed Protection **[Bill No. 98–1975]**
 R.C. 5—Resource Conservation—Rural Residential **[Bill No. 98–1975]**
 R.C. 6—Rural Conservation and Residential **[Bill No. 73–2000]**
 R.C. 7—Resource Preservation Zone **[Bill No. 74–2000]**
 R.C. 20—Resource Conservation—Critical Area **[Bill Nos. 32–1988; 6–1989]**
 R.C. 50—Resource Conservation—Critical Area—Agricultural **[Bill Nos. 32–1988; 6–1989]**
 R.C.C.—Resource Conservation—Commercial **[Bill No. 103–1988]**
 The bracketed references to the respective Baltimore County bill numbers appears in the BCZR.

6. " 'Aircraft' means any device used or designed for navigation of or flight in the air." Md. Ann.Code (1977, 1993 Repl.Vol., 1998 Supp.), § 5–101(f) of the Transportation Article ("TA"). *See* 49 U.S.C. § 40102(a)(6) (" 'aircraft' means any contrivance invented, used, or designed to navigate, or fly in, the air.").

paved and its dimensions are approximately 165 feet by 172 feet.

In 1998, Martin Grass, Chairman of the Rite–Aid Corporation, and part owner of the thoroughbred business at Helmore Farm, commuted by helicopter from Helmore Farm to his office in Harrisburg, Pennsylvania.[7] The helicopter activity caused citizen opposition and led Edgar Lucas to file a petition with the Baltimore County Zoning Commission for a special exception for operation of a landing area for both helicopters and fixed-wing aircraft at Helmore Farm. The proposed facility would consist of the existing helicopter landing pad, in addition to a separate landing strip, approximately 200 feet wide by 1,200 feet long, for fixed-wing aircraft.

Edgar Lucas filed a petition, with the Baltimore County Deputy Zoning Commission, for approval of an airport and/or helicopter operation on Helmore Farm as a legal, nonconforming use.[8] In the alternative, he sought a special exception for an airport, pursuant to BCZR Section 1A01.2.C.1.[9]

---

7. The record indicates that Grass paid sixty five percent of the helicopter landing pad's construction costs and also "assisted financially after the original zoning hearing."

8. The BCZR defines "nonconforming use" as "[a] legal use that does not conform to a use regulation for the zone in which it is located or to a special regulation applicable to such a use. A specifically named use described by the adjective 'nonconforming' is a nonconforming use. [Bill No. 18–1976][.]" BCZR § 101.

9. The term "special exception" refers to a
"grant by a zoning administrative body pursuant to existing provisions of zoning law and subject to certain guides and standards of special use permitted under provisions of existing zoning law." It is a part of a comprehensive zoning plan, sharing the presumption that it is in the interest of the general welfare and is, therefore valid. It is a use which has been legislatively predetermined to be conditionally compatible with the uses permitted as of right in a particular zone. . . . In sum, special exception is a "valid zoning mechanism that . . . the legislative body has determined can, *prima facie,* properly be allowed in a specified use district, absent any fact or circumstance in a particular case which would change this presumptive finding." *People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 747–48, 584 A.2d 1318 (1991) (citations and footnote omitted).

A hearing took place before the Deputy Zoning Commissioner for Baltimore County ("Deputy Commissioner"), which highlighted the proposed use of the facility. Appellees appeared in opposition to Edgar Lucas's request for the special exception. Edgar Lucas was the only witness called to testify regarding the past usage of Helmore Farm for the landing and taking-off of fixed-wing aircraft and helicopters. The Deputy Commissioner denied his request for approval of a legal nonconforming use, concluding that his testimony was insufficient to establish the requisite prior existence of an airport or helicopter operation.

The Deputy Commissioner, however, approved the special exception. He based his decision on testimony and evidence presented both in support of and in opposition to Edgar Lucas's petition, his site visit to observe the arrival and departure of a helicopter and fixed-wing aircraft, and the inclusion of "helicopters" in the dictionary definition of the word "aircraft." The special exception, however, included several restrictions and conditions to ensure no intensified use of the facility would occur.[10]

---

**10.** The following terms and restrictions were included in the special exception:

1) The Petitioners are hereby made aware that proceeding at this time is at their own risk until the 30-day appeal period from the date of this Order has expired. If an appeal is filed and this Order is reversed, the relief granted herein shall be rescinded.

2) The special exception granted herein is limited to the current owners and operators of Helmore Farms, specifically, the Lucas family. It shall not be transferable to any third party. In the event that this property is sold or the Helmore Farms thoroughbred horse farm operation ceases to do business at this location, then the special exception granted herein shall cease and, terminate.

3) The airport operation shall be limited to one (1) landing and take-off of a fixed wing aircraft per week. This restriction shall not apply to Mr. Lucas' personal aircraft, such as the proposed Maule fixed-wing aircraft, the brochure of which was submitted into evidence as Petitioner's Exhibit 6. In the event Mr. Lucas purchases this private fixed-wing aircraft, he may come and go from his property as is necessary. However, this restriction pertains to the landing of aircraft by those other than the Petitioner. Furthermore, this restriction shall not apply to the weekends during which the Triple Crown races are held, that being the Kentucky Derby, Preakness and Belmont

Stakes. The Petitioner shall be permitted to have multiple fixed-wing landings and take-offs on those weekends, only.

4) There shall be no more than two helicopter events on any given day. A helicopter event consists of an arrival and a departure. Said landings and take-offs shall occur between the hours of 7:00 AM and 10:00 PM as stated heretofore. There shall be no helicopters permitted to land at this airport that exceed the decibel level generated by the Augusta A–109. This restriction is imposed upon the Petitioner in order to limit the size and type of helicopters which will be permitted to utilize this airport. The noise level of the Augusta A–109 helicopter was acceptable to this Deputy Zoning Commissioner; however, there are many other helicopters whose noise levels may not be acceptable. Therefore, it is necessary to restrict to the extent possible the type of helicopter permitted to land on the subject property. This restriction shall not apply to the weekends during which the Triple Crown races are held, that being the Kentucky Derby, Preakness, and Belmont Stakes. The Petitioner shall be permitted to have multiple helicopter landings during those weekends.

5) All helicopters shall be prohibited from landing and taking off in a direction that would carry the helicopter in a westerly direction over the lands owned by the Immelt or Carroll families. All landings and take-offs of helicopters shall proceed in the direction of Falls Road, thereby flying over the Meadowwood, Inc. property, currently owned by Baltimore County for use by its Department of Recreation and Parks.

6) There shall be no landing or taking off of aircraft from the subject property prior to 7:00 AM on any given day, or after 10:00 PM on any given evening.

7) There shall be no fueling of any type of aircraft on the subject property.

8) The storage of aircraft not owned by the Petitioner shall not be permitted on the subject property for any more than 14 consecutive days.

9) There shall be no aircraft repair of any kind taking place on the subject property, except for emergency repairs.

10) There shall be no sale of aircraft from the subject property.

11) The Petitioner shall be required to install a double row of white pine trees along the western boundary of his property from the northern boundary of the special exception area, south along the western property line and terminating at the existing tree line which buffers the Jones Falls waterway from the subject property. This double row of white pine trees is an attempt to further mitigate the noise levels generated by the aircraft that come and go from the subject site. Along these lines, the Petitioner shall submit for review and approval by Mr. Avery Harden, the Landscape Architect for Baltimore County, a landscape plan depicting this double row of pine trees along the western property line of the subject property in the area described above. The existing tree line in this area is mostly deciduous, wherein the ability of those trees to buffer the sound generated from this airport would be significantly reduced during the winter months. Therefore, it is necessary to supplement this existing vegetation by way of these additional plantings.

People's Counsel appealed the Deputy Commissioner's decision to the Board. The Board considered two questions on appeal:

1. Is the site an airport permitted within the R.C. 2 zone; and, if so, are helipads and helistops permitted uses within the meaning and definition of an "airport"; and

2. Based on the weight of the testimony and evidence submitted at the hearings, has the Appellant met his burden that the use proposed does not produce any "adverse effects above and beyond those inherently associated with such special exception uses irrespective of its location in the zone."

On February 25, 2000, the Board issued its opinion, stating: Since 1979, there have been significant amendments to other [provisions in] R.C. 2 zones, but no further amendments to the provisions relative to "airports," "airstrips," and helicopter uses. So, at the present time, under current BCZR regulations, we have the present status concerning where certain facilities are permitted by special exception and by right.

By special exception:
Airport : R.C. 2, R.C. 3, D.R. 1,[11] B.R.[12]

Airstrip : M.L.R.,[13] M.L.[14]

---

12) When applying for any permits, the site plan and landscaping plan filed must reference this case and set forth and address the restrictions of this Order.

13) All helicopters coming and going from the subject property shall be required to fly over I-83 and Falls Road when arriving/departing the airport. No helicopters shall be permitted to fly over Greenspring Station and the adjacent community of Heatherfield at any time. Multiple violations of this provision shall result in a revocation of the special exception granted herein.

The first twelve provisions were contained in the Deputy Commissioner's opinion, dated August 5, 1998. The final restriction was included in his amended order, dated August 6, 1998.

11. Density Residential Zone ("D.R.").

12. Business, Roadside Zone ("B.R.").

13. Manufacturing, Light, Restricted Zone ("M.L.R.").

14. Manufacturing, Light ("M.L.").

| | | |
|---|---|---|
| Heliport, I | : | B.M.,[15] B.R. |
| Heliport, II | : | B.L.,[16] B.M., B.R., M.L.R. |
| Helistop | : | R.C. 3, D.R. zones |
| By right: | | |
| Airport | : | None |
| Airstrip | : | None |
| Heliport, I | : | M.L., M.H.[17] |
| Heliport, II | : | M.R.,[18] M.L. |
| Helistop | : | B.L., B.M., B.R., M.R., M.L.R.; M.L., M.H. |

The Board went on to note that "certain helicopter operations are permitted as provided by Section 420 of the BCZR." [19] The Board concluded that the R.C. 2 zone permits an "airport" by special exception, but prohibits "heliports," "helistops," or "airstrips." Accordingly, the Board denied Edgar Lucas's petition for either approval of an airport and/or helistop operation as a legal nonconforming use or for a special exception for an airport pursuant to BCZR § 1A01.2.C.1.

The Board determined that the definition of "airstrip" would not include helicopter operations and that a special exception would not permit the uses proposed at Helmore Farm:

While the BCZR describes an airport as "any area of land or water designated and set aside for landing or taking off of aircraft," and a helicopter fits the definition of "any

---

15. Business, Major Zone ("B.M.").

16. Business, Local Zone ("B.L.").

17. Manufacturing, Heavy Zone ("M.H.").

18. Manufacturing, Restricted Zone ("M.R.").

19. We will discuss Section 420 *infra*.

rotary aircraft," nevertheless ... the legislative history and intent of the uses permitted by special exception in R.C. 2 zone[s] clearly precludes such uses by helicopters.

* * *

Had the County Council not sought to specifically separate and define helicopter uses in various zones, this Board might believe differently, and in so doing, adopt the Appellant's belief that the interpretation of an "airport" includes "heliport or helistop." That however, is not the case. Clearly the Legislative Council of Baltimore County had very narrowly addressed helicopters and uses within the various zones.

In the alternative, assuming that helicopter operations were included in the definition of "airport," the Board examined whether appellant met his burden concerning the "impact" factors required pursuant to BCZR 502.1 and in *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981). In reaching that determination, the Board used the following standard: "The question is one of whether or not the adverse effects are greater at the proposed site than they would be elsewhere in the County where they may be established, i.e., the other areas within the R.C. 2 zones." The Board noted that it believed that "the appellant has the burden of establishing that the impact factor caused by the proposed use is not greater at the site than the same use elsewhere in the zone (R.C. 2 zone)."

The Board concluded that

the impact upon the National Historic District would be greater in the Greenspring Valley than if located in other northern areas of the R.C. 2 zones. Relying considerably on the expertise of [expert witnesses] Messrs. Dillon, Solomon and Gerber, there are individual areas in the Northern part of the county that would be less impacted than at the present site. The Board concludes that it is not a matter of finding a better site for the proposed use in the R.C. 2 zone, but rather the question is one of total impact; and the

Board concludes that the Appellants have not established that fact by the preponderance of the evidence to the Board's satisfaction. Acknowledging that airports and helicopter uses have inherent negative impacts, the detrimental effects upon the smaller Greenspring Valley district would clearly have a greater negative impact than if located elsewhere in the vast acreage constituting the R.C. 2 zone of Baltimore County.

A timely petition for judicial review was filed by appellant. On September 28, 2000, the Circuit Court for Baltimore County held a hearing.

The first issue before the circuit court was whether the Board erred in its determination that the proposed use did not constitute an airport. The court held that "an airport does not include a heliport or helistop and the proposed use is not an 'airport,' therefore it is not a permitted use in an R.C. 2 zone, and the Board's conclusion was reasonably based upon the facts proven."

The second issue before the circuit court was whether the Board erred as a matter of law by utilizing an incorrect interpretation of the special exception standard. Although the court thought it unnecessary to address this question, based on its finding on the first question, the court affirmed the Board's determination regarding the adverse impact that would have been caused if the special exception had been granted. On March 20, 2001, the court issued its memorandum and order affirming the Board's decision. Appellant then filed this appeal.

## II. Standard of Review

In *Eastern Outdoor Adver. Co. v. Mayor & City Council of Baltimore*, 128 Md.App. 494, 514–15, 739 A.2d 854 (1999), *cert. denied*, 358 Md. 163, 747 A.2d 644 (2000), we set out the applicable standard for reviewing the decision of an administrative agency:

[C]ourts recognize two standards of review of a decision of a zoning board: one for the board's conclusions of law and

another for the board's findings of fact or conclusions of mixed questions of law and fact. When reviewing the board's legal conclusions, the court "must determine whether the agency interpreted and applied the correct principles of law governing the case and no deference is given to a decision based solely on an error of law." When reviewing findings of fact and conclusions regarding mixed questions, however, [we] "cannot substitute [our] judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record." If a court finds no substantial or sufficient evidence to support the factual findings of the Board, the Board's decision will be reversed because it was arbitrary and illegal. [Citations omitted.]

See also *Eastern Outdoor Adver. Co. v. Mayor & City Council of Baltimore,* 146 Md.App. 283, 299–302, 807 A.2d 49 (2002) ("*Eastern Outdoor II*").

■■■ The substantial evidence test is an "assessment of whether the record before the Board contained at least 'a little more than a scintilla of evidence' to support the Board's scrutinized action." *Friends of the Ridge v. Baltimore Gas & Elec. Co.,* 120 Md.App. 444, 466, 707 A.2d 866 (1998), *vacated in part,* 352 Md. 645, 724 A.2d 34 (1999) (citation omitted). The existence of such substantial evidence "pushes the Board's decision into the unassailable realm of a judgment call, one for which we may not substitute our own exercise of discretion." *Friends of the Ridge,* 120 Md.App. at 466, 707 A.2d 866.

■■■ Because we repeat the reviewing task of the circuit court, this Court reevaluates, under the same standards, the decision of the agency, not that of the circuit court. *Carriage Hill–Cabin John, Inc. v. Maryland Health Resources Planning Comm'n,* 125 Md.App. 183, 211, 724 A.2d 745 (1999). The Court of Appeals has set out the applicable standard of review of the grant or denial of a special exception use:

The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in

the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption.* The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material. If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception use is arbitrary, capricious, and illegal.

*Schultz,* 291 Md. at 11, 432 A.2d 1319 (citations omitted; emphasis in original); see also *Eastern Outdoor II,* 307–09, 807 A.2d 49.

### III. Discussion

#### A. Definitions and Legislative History

We begin by reviewing the purpose of local zoning laws, which the Court of Appeals reiterated in *Schultz:*

Zoning provides a tool by which to establish general areas or districts devoted to selected uses. Indeed, the very essence of zoning is the territorial division of land into use districts according to the character of the land and buildings, the suitability of land and buildings for particular uses, and uniformity of use. [Citations omitted.]

*Schultz*, 291 Md. at 20, 432 A.2d 1319.

 In addition, we must consider any constitutional rights that may be affected:

Any discussion of any zoning matter, be it, *inter alia*, rezoning, special exceptions/conditional uses,[20] or variances, must always recognize that zoning is an interference (if done correctly, a permissible one) with a property owner's constitutional rights to use his own property as he sees fit. The Fifth Amendment to the United States Constitution provides, in pertinent part:

No person shall be ... deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation.

*Mossburg v. Montgomery County*, 107 Md.App. 1, 5–6, 666 A.2d 1253 (1995), *cert. denied, sub nom. Twin Lakes Citizens v. Mossburg*, 341 Md. 649, 672 A.2d 623 (1996). *See also* Article 24 of the Maryland Declaration of Rights.

This Court has stated the following in regard to special exceptions:

[A] special exception/conditional use in a zoning ordinance recognizes that the legislative body of a representative government has made a policy decision for all of the inhabitants of the particular governmental jurisdiction, and that

---

**20.** " 'A special exception involves a use which is permitted ... once certain statutory criteria have been satisfied.' " *Mossburg v. Montgomery County*, 107 Md.App. 1, 7, 666 A.2d 1253 (1995) (citation omitted), *cert. denied, sub nom. Twin Lakes Citizens v. Mossburg*, 341 Md. 649, 672 A.2d 623 (1996). A conditional use " 'is a desirable use which is attended with detrimental effects which require that certain conditions be met.' " *Id.* In Maryland, the terms "special exception" and "conditional use" are effectively synonymous. *See Hofmeister v. Frank Realty Co.*, 35 Md.App. 691, 698, 373 A.2d 273 (1977).

the exception or use is desirable and necessary in its zoning planning provided certain standards are met.

*Mossburg,* 107 Md.App. at 7–8, 666 A.2d 1253.

In this case, it is the identification of the proposed uses as they relate to permitted special exception uses that is at issue. The Board defined "airstrip" as "[a] runway without normal airbase and airport facilities. A clearing area serving a landing strip." [21] Although the BCZR does not contain a definition of the term "airstrip," the term "airport" is defined as "[a]ny area of land or water designed and set aside for landing or taking off of aircraft." BCZR § 101.[22]

In 1955, comprehensive revisions of the zoning regulations included "airports" as a special exception in certain zoning districts. It was not until 1961 that the Council enacted Bill 56 and created the M.L.R. zone, which permitted "airstrips" and "heliports" as special exceptions.

As early as 1966, the Baltimore County Planning Board, in its Final Report for Proposed Amendments to the Baltimore County Zoning Regulations, included a proposal for helicopters due to "the increasing use of helicopters in the County and inadequate provisions for helicopter landing facilities in the present Zoning Regulations." Final report of the Baltimore County Planning Board, Office of Planning and Zoning, August 11, 1966. That report culminated in the Board's

---

**21.** "Airstrip" is not defined in the BCZR. The MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 26 (10th ed.2000), defines "airstrip" as "a runway without normal air base or airport facilities." *See* 49 U.S.C. 40102(a)(28) (" 'landing area' means a place on land or water, including an airport or intermediate landing field, used, or intended to be used, for the takeoff and landing of aircraft, even when facilities are not provided for sheltering, servicing, or repairing aircraft, or for receiving or discharging passengers or cargo.").

**22.** TA § 5–101(h) defines "[a]irport" as "any area established for the landing and taking off of aircraft, including any appurtenant airport facilities." *See* 49 U.S.C. 40102(b)(9) (" 'airport' means a landing area used regularly by aircraft for receiving or discharging passengers or cargo;" The MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 26 (10th ed.2000) defines "airport" as "a place from which aircraft operate that [usually] has paved runways and maintenance facilities and often serves as a terminal.").

enactment of Bill 85, which defined helicopter, helicopter operation, heliport, type I, heliport, type II, and helistop as follows:

**Helicopter**—Any rotary-wing aircraft which depends principally for its support and motion in the air on the lift generated by one or more power-driven rotors rotating on substantially vertical axes. **[Bill No. 85–1967]**

**Helicopter Operation**—A landing and takeoff by a helicopter. **[Bill No. 85–1967]**

**Heliport, Type I**—Any area of land, water or structural surface which meets the design standards of the Federal Aviation Agency and has been authorized by the Maryland State Aviation Administration to be used for scheduled operations by helicopter carriers certified by the Civil Aeronautics Board. **[Bill No. 85–1967]**

**Heliport, Type II**—Any area of land, water or structural surface which has been authorized by the Maryland State Aviation Administration to be used for nonscheduled but regular helicopter operations and which does not serve for major support operations. As used herein, the term "major support operations" means "maintenance other than fueling; cargo loading; or any accessory operations using 2,500 square feet or more of floor area." **[Bill No. 85–1967]**

**Helistop**—Any area of land, water or structural surface which is located at least 500 feet from any property line, which has been authorized by the Director of Public Safety to be used for helicopter operations, which is not a heliport, and which does not serve for major support operations (see definition for "heliport, Type II"); or any area of land, water or structural surface which is located closer than 500 feet to a property line, which has been authorized by the Director of Public Safety to be used for not more than 15 helicopter operations per month, which is not a heliport, and which does not serve for major support operations. **[Bill No. 85–1967]** [Footnotes omitted.]

*See* BCZR § 101.

In addition, Bill 85–1967 added BCZR § 420, Helicopter Operations:

420.1—Notwithstanding other provisions of these regulations to the contrary, certain helicopter operations shall be permitted as provided under this Section 420.

420.2—Temporary use may be made of an area for helicopter flights for promotional activities, providing that such area shall be at least 500 feet from any occupied residence and that use permits shall be first procured from the Director of Public Safety and the Zoning Commissioner and that such permits shall be limited as to time as specified by the Zoning Commissioner.

420.3—Helicopters may be used to move equipment and supplies at construction sites, provided that a permit for such use is first obtained from the Director of Public Safety.

420.4—Helicopters may make landings on public utility rights-of-way and, with the owners' consent, on land adjacent thereto for purposes of inspection or repairs of public utility facilities.

420.5—No special exception shall be required to permit either a Type I or Type II heliport if such use is located: at least 1,000 feet from any property line; in a D.R. 5.5 or D.R. 1 Zone; and beyond the urban-rural demarcation line.

420.6—Any helicopter operation caused by emergency is permitted at any time in any zone, in accordance with current regulations of the Federal Aviation Agency. [Footnotes omitted]

These provisions permitted an "airport" and a "helistop" as special exceptions in an R.C. 2 zone.

In 1970, the Council created "Density Residential" zones, permitting by special exception both "airports" and "helistops." Bill 100. In 1975, Bill 98–75 reclassified all zones and created R.C., "resource conservation" zones.[23] "Airports" and "helistops" were permitted as special exceptions in the R.C. 2 and R.C. 3 zones, but were not permitted in R.C. 4 and R.C. 5 zones.

---

**23.** Bill 98–75 replaced "Rural: Deferred–Planing" and "Rural–Suburban: Conservation" zones with the newly created R.C. zones.

In the late 1970's, the Council enacted Bill 178–79, which repealed the special exception use for a "helistop" in an R.C. 2 zone, but retained the special exception for "airport" use. The new ordinance left the special exceptions for "airport" and "helistop" in other R.C. zones intact.

The current version of the BCZR regarding R.C. 2 zone uses and special exceptions permits a special exception for "airports," but not "helistops" or "airstrips." BCZR 1A01.2.C.1.

Our examination of the special exception uses involving aviation uses permitted in the R.C. zones reflects the following: [24]

| | R.C. 2 | R.C. 3 | R.C. 4 | R.C. 5 | R.C. 6 | R.C. 7 | R.C. 20 | R.C. 50 | R.C.C. |
|---|---|---|---|---|---|---|---|---|---|
| Airport | ✓ | ✓ | × | × | × | × | × | × | × |
| Airstrip | × | × | × | × | × | × | × | × | × |
| Heliport, Type I | × | × | × | × | × | × | × | × | × |
| Heliport, Type II | × | × | × | × | × | × | × | × | × |
| Helistop | × | ✓ | × | × | × | × | × | × | × |

## B. Airport

Appellant argues that the Board's holding ignores the plain meaning of the word "airport" and that the proposed use at Helmore Farm should have been identified as such. Because the property will be used for both fixed-wing aircraft and helicopters, "airport" is the only classification that permits both types of aircraft, the proposed land use is that of an "airport" and not an airstrip, heliport, or helistop.

Appellees argue that both the plain meaning of the regulations and the subsequent history related to airports, airstrips, heliports, and helistops indicate a clear legislative intent to distinguish between these various uses and that these distinctions prevent the designation of appellant's proposal as an

---

**24.** A (✓) indicates that the use is permitted by special exception, and an (X) indicates that the use is not permitted by special exception.

"airport." [25]

 "[T]he plain meaning rule of construction is not absolute." *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590 (1992). Here, if we focus solely on a plain meaning of "airport," as appellant argues, in isolation from other provisions within the ordinance, we remove it from its context within the ordinance as a whole. The Court of Appeals has noted that

a statute must be construed in context, because the meaning of the "plainest language may be governed by the context in which it appears." In this regard, words in a statute must be read in a way that advances the legislative policy involved. Courts may, therefore, consider not only the literal or usual meaning of those words, but their meaning and effect in the context in which the words were used, and in light of the setting, the objectives, and purpose of the enactment. Moreover, in such circumstances, courts may consider the consequences that may result from one meaning rather than another, with real intent prevailing over literal intent. [Citations omitted.]

*Baltimore County Coalition Against Unfair Taxes v. Baltimore County,* 321 Md. 184, 203–04, 582 A.2d 510 (1990). *See State v. Bell,* 351 Md. 709, 718, 720 A.2d 311 (1998) (statutory language is not read in isolation and must be read in the full context it appears).

Paul Solomon, accepted as an expert planner with particular expertise in Baltimore County's resource conservation zones, testified that the typical characteristics associated with an airport include:

a strip to land an airplane, or series of strips and support facilities, including hangers, gas tanks, diesel tanks. So it would include the facilities to land a plane and to service a plane, and service the passengers that are involved with that airport, so it could be a very large airport, it could be a small airport, it could be simply fixed-wing.

---

**25.** People's Counsel also argues that the Board erred in defining the helicopter area as a heliport, rather than a helistop.

Norman E. Gerber, accepted without objection as an expert in the field of zoning and land use planning, testified that the operation proposed at Helmore Farm describes an "airfield," not an "airport." Gerber based his opinion on the fact that

the only two places that airstrips show up in the zoning regulations are in the ML zone and by virtue of including ML zones in the MH zone, and they were thought to be the kinds of areas where they could be paved, but didn't have to be. They were simply a place for a plane to land ... **This seems to be the kind of activity that I heard about and read about so far being proposed here.**

On the other hand, an airport generally is used—it is used with more of a full service type of facilities in that there are facilities to care for the aircraft in some fashion. There are facilities to care for potential passengers, or maybe even cargo. I haven't heard any real discussion of those kind of facilities being proposed to be placed here. So I believe that the term "airport" is more applied to those kinds of facilities.

There are only a few, quote, airports in Baltimore County. Probably the best known is the Martin State Aviation Airport. There are a couple privately owned airports which I hope one is still in operation, but I'm not sure. There is one on Back River Neck, which has been there for some time. And there's one out, which can be seen as you drive up I–95, just before you enter into Harford County, I guess. To my knowledge, they are the only airports left operating in Baltimore County as an airport.

Then, Martin Airport is much bigger than the other two. They have a wide variety of the kinds of facilities I am talking about at each of those.

**But, to me, I believe that's how zoning regulations views an airport and how that views an airstrip.**

I believe that's perfectly consistent with the way the RC 2 zones were developed, because one would not expect to see a lot of airports in Baltimore County, even in 1969, '70, '71, '72, and '79, probably even less so today, based upon the

demand; the fact the Martin Airport has taken up a great deal of whatever void was thought to have been in Baltimore County in those other decades.

On the other hand, an airstrip could normally be expected to be found at a lot of locations in terms of the kind of use. So far, they have only been permitted in the ML and MH zones in Baltimore County.

\* \* \*

If the Baltimore County zoning regulations hadn't gone to such great length to provide for helicopter operations, heliports, type I and heliport type II and helistops, and listed them specifically within zones, I would think that, in other words, if it was silent insofar as distinguishing between helicopter type operations and airports, then perhaps [helicopter use at an airport] would be correct.

But that's not the case here. Baltimore County, through its zoning regulations, chose to further define aircraft operation and talk about, at great length, helicopters, and whether they are to be permitted or not permitted.

And, as has been pointed out earlier today, but, again, for instance, airports are permitted by special exception in the RC 2. No helicopter type operation is permitted as of right except the Section 420 which is basically set up for special uses, emergencies, that sort of thing.

They are not permitted. They are not listed a being permitted. I believe further evidence, that it was clear that the regulations intended not to permit helicopter operations in RC 2. [Emphasis added.]

The Board stated:

Considerable weight attaches to the testimony of Mr. Paul Solomon and Norman Gerber as to the characteristics typically found in an airport use: Solomon: (1) strip or strips to land an aircraft: (2) gas tanks; (3) support facilities; (4) hangers, gas tanks, diesel tanks; (5) the facilities to land and to service a plane; (6) the facilities to service passengers; (7) parking lot (or lots); and (8) infrastructure by way

of road access; Gerber: "The thing that comes closest to describing the kind of operation I [read about,] heard about (during the hearings), and I believe is the airstrip."

The Board determined that the "R.C. 2 zone clearly precludes such uses by helicopters." The Board's conclusion was based on substantial evidence on the record and was one that reasoning minds could have reached. We are not persuaded by appellant's argument that, because his facility would accommodate both fixed-wing aircraft and helicopters, and does not fit into a more distinct use category related to helicopter facilities and helistops, it must, therefore, be considered an "airport." The Board found that the proposed facility "cannot, by any stretch of the imagination, be construed as an airport. It is obvious to the Board that there are distinctions between an 'airport' and an 'airstrip.' To permit continued use thereof as an airstrip is in direct violation of" the BCZR. The Board based it determination on the fact that an "airstrip" was not permitted in an R.C. 2 zone. BCZR § 102.1 reads: "[n]o land shall be used or occupied and no building or structure shall be erected, altered, located, or used except in conformity with these regulations and this shall include any extension of a lawful nonconforming use." *See Kowalski v. Lamar*, 25 Md. App. 493, 496, 334 A.2d 536 (1975).

In light of the legislative history, it is appropriate to view the specific designations of airstrip, helistop, and helipad as modifications of the general term "airport," and creating distinct and separate uses for different levels of aircraft operations. The marriage of an airstrip with a helistop and helipad does not create an airport. We affirm the decision of the Board that the proposed use of Helmore Farm was not that of an airport.

Appellant has raised several other issues in this appeal, which, in light of our affirmance of the Board's decision that the proposed facility is not an airport for purposes of a special exception within the R.C. 2 zone, we need not reach for the purposes of deciding this case. Nevertheless, we shall address these issues for completeness.

### C. Helicopter Operations

■ Based on his contention that his use is that of an airport, a contention rejected by the Board and us, appellant argues that the Board erred in ruling that the BCZR definition of an airport does not include helicopter operations. He argues that an "airport" permits the landing and taking off of "aircraft" and that the dictionary definition of "aircraft" includes helicopters. Again, appellees argue that the plain meaning of terms cannot be taken out of context. Therefore, they argue that the subsequent history related to heliports and helistops expressed a legislative intent to differentiate helicopter uses from airport uses.

As we previously stated, to focus on one word in isolation would remove it from its context. Although appellant is correct in his assertion that a helicopter is a type of aircraft, the legislative history and BCZR's definitions expressly differentiate zones that permit helicopter operations. In fact, the regulations go so far as to differentiate a type I and type II heliport and a helistop. Based on the amended BCZR, an R.C. 2 zone permits a special exception for an "airport," but expressly prohibits a special exception for an "airstrip," "heliport," or "helistop."

The use of helicopters in the R.C. 2 zone has been prohibited in the past. In 1989, Robert J. Smith, Case No. 90–1–SPHX, petitioned the Deputy Zoning Commissioner of Baltimore County for a special exception to use a helicopter in the R.C. 2 zone. The Deputy Zoning Commissioner relied on the legislative history regarding the distinction between airports and helicopter operations to conclude that the term "airport" was not broad enough in scope to provide the landing and take off of helicopters in the R.C. 2 zone. The Board in that case concluded that helicopter operations were "clearly precluded" uses within the R.C. 2 zone.

To adopt appellant's general definition that an "airport" permits helicopter operations in the R.C. 2 zone would negate the specific zoning restrictions adopted by the Council regarding airports, helistops, and helipads and its prior intention not

to permit helicopter operations in the R.C. 2 zone. *See Greco v. State,* 347 Md. 423, 429, 701 A.2d 419 (1997); *see also Superior Builders, Inc. v. Brown,* 208 Md. 539, 543, 119 A.2d 376 (1956) ("The Act should receive a practical construction, and should be so interpreted and construed as to effectuate its general purpose.").

We find only four zones in the BCZR that permit, by special exception or by right, the use of helicopters and an airport: the R.C. 3 (Resource Conservation—Deferral of Planning and Development); D.R. 1 (Density Residential, 1.0 dwelling unit per acre); B.R. (Business, Roadside); and M.L. (Manufacturing, Light) zones. Unlike the R.C. 2 zone, the R.C. 3 zone was never amended, and therefore permits as a special exception both "airports" and "helistops." BCZR § 1A02.2B1.

Based on the BCZR's history of categorizing helicopter operations separately from airports, the Board's conclusion that the definition of "airport" does not include general helicopter operations is not wrong, as a matter of law, and was supported by substantial evidence. Therefore, the Board was not in error.

### D. Special Exception Standard

#### i. Adverse Effect of the Proposed Airport

 Appellant argues that the Board "identified and applied an incorrect special exception standard." Specifically, he contends that the Board erred when it "failed to properly compare the effects of the proposed use to 'the effects normally inherent with such a use.' " Instead, he argues, "the Board compared the adverse impacts of the proposed Helmore Farm airport at this location to the adverse impacts of the Helmore Farm airport elsewhere in the R.C. 2 zone." Appellees argue that appellant did not meet his burden of proving the facts required to satisfy the special exception standard.

We begin by recognizing the inherent validity of special exception uses. *Schultz,* 291 Md. at 11, 432 A.2d 1319; *see Mossburg,* 107 Md.App. at 7–8, 666 A.2d 1253. As we have stated, special exception uses are "desirable and necessary in

... zoning planning provided certain standards are met." *Mossburg*, 107 Md.App. at 7–8, 666 A.2d 1253.

The Court of Appeals in *Schultz* established the standard by which the adverse effects of a special exception use are to be measured. Judge Davidson stated for the Court:

We now hold that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects **above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.**

*Schultz*, 291 Md. at 22–23, 432 A.2d 1319 (citations omitted) (emphasis added).

This Court in *Hayfields, Inc. v. Valleys Planning Council, Inc.*, 122 Md.App. 616, 641, 716 A.2d 311 (1998), explained the standards established in *Schultz, supra,* and *Mossburg, supra:*

In *Mossburg,* Judge Cathell for this Court provided an example of how to "overlay" the statutory conditions of a county's special exception law with the restrictions in *Schultz.* Based on the *Mossburg* example, we have added the limiting language of *Schultz* to BCZR § 502.1(a). The test becomes:

—Before any Special Exception may be granted, it must appear that the use for which the Special Exception is requested will not:

a. **Be [more] detrimental to the health, safety, or general welfare of the** *locality* **involved [than the effects normally inherent with such a use would be generally elsewhere in the zone].** [Citations omitted; bold added; italics in original.]

*See Mossburg,* 107 Md.App. at 21, 666 A.2d 1253.

In other words, the question is not whether the proposed facility will have some adverse effect on the Greenspring Valley area; it will because there are inherently detrimental

effects associated with such facilities. The Board must determine whether the adverse effects of the special exceptions use in the particular location in which it is sought to be located would be greater or more detrimental than they would be generally at other locations within the R.C. 2 zone. Utilizing the standard as set out in *Schultz,* the Board determined that the "question is one of whether or not the adverse effects are greater at the proposed site than they would be elsewhere in the County where they may be established, i.e., the other areas within the R.C. 2 zones." The Board noted:

During the course of several hearing days, the Board heard an abundance and plethora of testimony from a number of acknowledged experts in the fields of aviation, airport planning, local planning, and general horse operations. Much of the testimony was conflicting and contradictory. The Board recognizes that the expert witness has become a standard component of the zoning hearing. Professional planners make frequent appearances on all zoning forums and are to be listened to carefully. However, in the final analysis, it is up to the Board to make a critical appraisal of such witnesses.

\* \* \*

Based on the testimony, evidence and weight assigned thereto, the Board has determined that the impact of the proposed facility at the subject site would be greater there than at any other location in the R.C. 2 zone.

After issuing its holding, the Board reiterated its analysis of the special exception standard, stating:

The Board believes that the Appellant has the burden of establishing that the impact factor caused by the proposed use is no greater at the site than the same use elsewhere in the zone (R.C. 2 zone).

To that end, the Board concludes that the impact upon the National Historical District would be greater in the Greenspring Valley than if located in other northern areas of the R.C. 2 zones. Relying considerably on the expertise

of Messrs. Dillon, Solomon and Gerber, there are individual areas in the Northern part of the county that would be less impacted than at the present site. The Board concludes that it is not a matter of finding a better site for the proposed use in the R.C. 2 zone, but rather the question is one of total impact; and the Board concludes that the Appellants have not established that fact by the preponderance of the evidence to the Board's satisfaction. Acknowledging that airport and helicopter uses have inherent negative impacts, the detrimental effects · upon the smaller Greenspring Valley district would clearly have a greater negative impact than if located elsewhere in the vast acreage constituting the R.C. 2 zone of Baltimore County.

The Board obviously assigned considerable weight to the testimony of Messrs. Dillon, Solomon, and Gerber. Based on that evidence, the Board determined that, at Helmore Farm, the adverse effects inherently associated with the proposed facility would be above and beyond the adverse effects associated with an airport elsewhere in the R.C. 2 zone. The record clearly indicates that there are other parcels within the R.C. 2 zone where an airport would provide a lesser adverse impact than at Helmore Farm, and the Board recognized that finding a better site was not the issue. We believe that the Board applied the appropriate standard.

### ii. Special Exception Relevant Area

Appellant argues that "the Board failed to correctly apply the special exception standard as it did not review the 'detriment to adjoining and surrounding properties.'" He contends that the Board erred in its examination of the adverse effects on the Greenspring Valley generally and the entire R.C. 2 zone." Appellees argue that the Board did not commit error when it considered the Greenspring Valley area's unique characteristics as an agricultural, historic, and thoroughbred business area, therefore providing a more flexible definition of the adjoining and surrounding properties.

The Court of Appeals has said that the standard is "whether the *neighboring properties in the general neighborhood would*

*be adversely affected." Schultz,* 291 Md. at 11, 432 A.2d 1319 (italics in original); *see also Eastern Outdoor II,* 128 Md.App. at 514, 739 A.2d 854. This Court, in *Hayfields,* stated:

> Under BCZR § 502.1(a), a special exception use is prohibited if it is "detrimental to the health, safety, or *general welfare* of the locality involved...." [T]o the denial of a petition for special exception, the **detriment to adjoining or surrounding properties at the instant site** must be different from the detriment that would occur elsewhere in the zone. [Italicized in original; bold added.]

*Hayfields,* 122 Md.App. at 655–56, 716 A.2d 311 (emphasis added). *See also Burgess v. 103–29 Ltd. Pshp.,* 123 Md.App. 293, 300, 718 A.2d 613, *cert. denied, 103–29 Ltd. v. Walkersville,* 352 Md. 335, 722 A.2d 63 (1998) (" 'Nevertheless, the neighborhood in any area must be an area which *reasonably* constitutes the immediate environs of the subject property.' ") (citation omitted; emphasis in original).

The Court of Appeals has noted that the word "neighborhood" is flexible. In *Alviani v. Dixon,* 365 Md. 95, 117–20, 775 A.2d 1234 (2001), the Court said that a neighborhood could be defined by a more flexible area, so long as the description "is precise enough to enable a party or an appellate court to comprehend the area that the Board considered[.]"

The Board relied on testimony regarding the adverse effect of the airport on the "land around Helmore Farm," on "the horse industry in the area," on the "historical district," and on "Greenspring Valley." The Board's definition of the relevant area does not provide the precision required for a party or an appellate court to comprehend the adversely affected area and to determine if the neighborhood reasonably constitutes the immediate environment of the subject property. Based on our holding that the proposed use is not "airport," however, there is no need to remand this case to the Board to reconsider the neighborhood and detriment to adjoining and surrounding properties.

### E. Special Exception Requirements of BCZR 502.1

Appellant argues that the Board incorrectly analyzed the special exception requirements of BCZR Section 502.1. BCZR 502.1 provides, in pertinent part:

Before any special exception may be granted, it must appear that the use for which the special exception is requested will not:

A. Be detrimental to the health, safety or general welfare of the locality involved;

\* \* \*

G. Be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these Zoning Regulations; [Bill No. 45 1982][26]

### i. Noise Levels

 One of the inherent problems with aircraft operations is the noise generated. Appellant contends that the Board erred in not utilizing the "average" noise standard in analyzing the inherent adverse effects associated with airport noise, regardless of its location within the R.C. 2 zone, citing *Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). Appellant also argues that

---

26. The remaining factors in BCZR § 502.1 are:
 B. Tend to create congestion in roads, streets or alleys therein;
 C. Create a potential hazard from fire, panic or other dangers;
 D. Tend to overcrowd land and cause undue concentration of population;
 E. Interfere with adequate provisions for schools, parks, water, sewerage, transportation or other public requirements, conveniences, or improvements;
 F. Interfere with adequate light and air; [Bill No. 45–1982]
 \* \* \*
 H. Be inconsistent with the impermeable surface and vegetative retention provisions of these zoning regulations; nor [Bill No. 45–1982]
 I. Be detrimental to the environmental and natural resources of the site and vicinity including forests, streams, wetlands, aquifers and floodplains in an R.C. 2, R.C. 4, R.C. 5, or R.C. 7 Zone. [Bill No. 74–2000]

the testimony on which the Board relied was unsupported and should not have been considered.

Appellees argue that the Board did not commit error in determining the proposed site's noise level and that it made its determination based upon evidence in the record that it deemed to be credible. In support of their argument, appellees direct us to numerous cases indicating that federal preemption under *Burbank, supra,* "does not extend to local zoning locational decisions."

The preemption doctrine stems from the Supremacy Clause of the United States Constitution: "This Constitution and Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The Court of Appeals has noted:

This clause has been interpreted to mean that "state laws which 'interfere with, or are contrary to the laws of Congress, made pursuant to the constitution' are invalid." *Wisconsin Public Intervenor v. Mortier,* [501 U.S. 597, 604,] 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532, 542 (1991) (quoting *Gibbons v. Ogden,* 22 U.S.(9 Wheat.) 1, 211, 6 L.Ed. 23, 73 (1824)). The Supreme Court has identified three situations in which federal law preempts state law. *English v. General Electric,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74 (1990). State law is preempted when Congress has explicitly defined the extent to which its enactment preempts state law. [*English,*]496 U.S. at 78, 110 S.Ct. at 2275, 110 L.Ed.2d at 74. When there is no explicit statement of preemption, state law which seeks to regulate conduct in a field that Congress intended the federal government to occupy exclusively is preempted. *Id.* at 79, 110 S.Ct. at 2275, 110 L.Ed.2d at 74. State law is also preempted to the extent that it actually conflicts with federal law, *id.; Maryland v. Louisiana,* 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 596 (1981), as "when compliance with both federal and state regulations is a physical impossibility". *Harrison v. Schwartz,* 319 Md. 360, 364, 572 A.2d 528, 530, *cert. denied,* 498 U.S. 851, 111 S.Ct. 143, 112 L.Ed.2d 110 (1990) [Some citations omitted.]

*Washington Suburban Sanitary Comm'n v. CAE–Link Corp.,*
330 Md. 115, 132–133, 622 A.2d 745 (1993), *cert. denied,* 510
U.S. 907, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993).

The federal commerce clause grants Congress extensive
power to regulate air traffic. U.S. Const. art. I, § 8, cl. 3;
*Burbank,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547. Pursuant to that authority, Congress enacted the Federal Aviation
Act of 1958, 49 U.S.C. § 1301 *et seq.,* a comprehensive plan
under which the Secretary of Transportation has the authority
to "regulate . . . air commerce[,]" and the "Noise Control Act
of 1972," a policy "to promote an environment for all Americans free from noise that jeopardizes their health or welfare."
49 U.S.C. § 1303(a); 42 U.S.C. § 4901(b).

 In *Burbank, supra,* the Supreme Court invalidated a
local noise regulation restricting the permissible times of
flights in and out of the Burbank airport. *Burbank,* 411 U.S.
at 625–26, 93 S.Ct. 1854. That case stands for the proposition
that only those local regulations that directly interfere with
aircraft operations are invalid. *See City of Burbank v. Burbank–Glendale–Pasadena Airport Authority,* 72 Cal.App.4th
366, 378, 85 Cal.Rptr.2d 28 (Cal.App.2d Dist.1999).[27] In other
words, "while a municipality may not control the source of the
noise (the aircraft), it may use its police powers to mitigate the
noise, such as the zoning power to assure harmonious development. 'Congress has preempted only local regulation of the
source of aircraft noise.'" *Burbank,* 72 Cal.App.4th at 379, 85
Cal.Rptr.2d 28, *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71
L.Ed.2d 866 (1982) (citing *San Diego Unified Port Dist. v.
Gianturco,* 651 F.2d 1306, 1313–14 (9th Cir.1981)). "[A] local
regulation may not restrict the use of aircraft or directly
control aircraft emissions, but may otherwise use its land use
powers to mitigate the noise." *Burbank,* 72 Cal.App.4th at

---

**27.** That proposition seems to support Justice Rehnquist's (now Chief
Justice) dissent in *Burbank:* "[T]he authority of units of local government to control the effects of aircraft noise through the exercise of land
use planning and zoning powers is not diminished by the [Noise
Control Act of 1972]." *Burbank,* 411 U.S. at 650, 93 S.Ct. 1854.

379, 85 Cal.Rptr.2d 28 (citing *San Diego Unified Port Dist. v. Gianturco, supra* ). Furthermore, 14 C.F.R. A150.101, Table 1, states that its computation standards leave the "responsibility for determining the acceptable and permissible land uses and the relationship between specific properties and specific noise contours ... with the local authorities."

In *Harrison v. Schwartz*, 319 Md. 360, 362, 572 A.2d 528, *cert. denied*, 498 U.S. 851, 111 S.Ct. 143, 112 L.Ed.2d 110 (1990), the Court of Appeals considered conditions imposed as a part of a conditional use approval for a "private airport site and drop zone for parachutists," which occupied a portion of a farm in Carroll County. The site had been designated by the State Aviation Administration as the "Woodbine Glider Port" and operated as a "Licensed Private/Commercial Airport." Two conditions were imposed on take offs to minimize "the adverse effects of airport noise." The Court summarized the aviation noise preemption debate by stating:

> Pursuant to that power [the Commerce Clause of the United States Constitution], Congress has enacted the Federal Aviation Act of 1958, 72 Stat. 731, and amended it by the Noise Control Act of 1972, 86 Stat. 1234. *See* 49 U.S.C.App. §§ 1301 *et seq.* The Noise Control Act provides that
>
>> In order to afford present and future relief and protection to the public health and welfare from aircraft noise and sonic boom, the FAA, after consultation with the Secretary of Transportation and with EPA, shall prescribe and amend standards for the measurement of aircraft noise and sonic boom and shall prescribe and amend such regulations as the FAA may find necessary to provide for the control and abatement of aircraft noise and sonic boom, including the application of such standards and regulations in the issuance, amendment, modification, suspension, or revocation of any certificate authorized by this subchapter. No exemption with respect to any standard or regulation under this section may be granted under any provision of this chapter unless the FAA shall have consulted with EPA before such exemption is granted, except that if the FAA determines that safety in air

commerce or air transportation requires that such an exemption be granted before EPA can be consulted, the FAA shall consult with EPA as soon as practicable after the exemption is granted.

49 U.S.C.App. § 1431(b)(1). Under the same section, the EPA is required to

submit to the FAA proposed regulations to provide such control and abatement of aircraft noise and sonic boom (including control and abatement through the exercise of any of the FAA's regulatory authority over air commerce or transportation or over aircraft or airport operations) as EPA determines is necessary to protect the public health and welfare.

49 U.S.C.App. § 1431(c)(1). In addition, numerous regulations bear on the topic of control of aircraft noise. *See, e.g.,* 14 C.F.R. Parts 36.1–36.7, 36.9, 36.101, 36.103, 36.201, 36.301, 36.501 (1989). The validity of the statutes and regulations is not questioned. Their implied preemptive effect is questioned. But that issue has in large part been resolved by the Supreme Court of the United States.

That Court's decision in *City of Burbank, supra,* is the "preeminent authority on the question of federal preemption in the area of aviation." *Blue Sky Entertainment, Inc. v. Town of Gardiner,* 711 F.Supp. 678, 691 (N.D.N.Y.1989). Furthermore, *City of Burbank* speaks directly to the problem of local efforts to control aircraft engine noise.

\* \* \*

The Court examined at length the provisions of the Federal Aviation Act and the Noise Control Act. It scrutinized the legislative history, which included a Senate Report and a letter from the Secretary of Transportation. The Senate Report explained, " 'States and local governments are preempted from establishing or enforcing noise emission standards for aircraft unless such standards are identical to standards prescribed under [the Noise Control Act of 1972].' " The letter from the Secretary of Transportation to

Senator Monroney declared that " 'State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft.' " 411 U.S. at 634–635, 93 S.Ct. at 1860, 36 L.Ed.2d at 554–555 (quoting S.Rep. No. 92–1160, pp. 10–11, 1972 U.S.Code Cong. & Admin. News 4655, 4663 and 1968 U.S.Code Cong. & Admin. News 2688, 2693–2694). It gave weight to the remarks of the Chairman of the House Committee on Interstate and Foreign Commerce to the effect that "we do not want" cities and states "to pass noise regulations." 411 U.S. at 636–637, 93 S.Ct. at 1861, 36 L.Ed.2d at 555 (quoting 118 Cong. Rec. 37083 (1972)). It noted Senator Tunney's view that under the 1972 Act there would be " 'proposed means of reducing noise in airport environments through the application of emission controls on aircraft, the regulation of flight patterns and aircraft and airport operations, and modifications in the number, frequency, or scheduling of flights [as well as] . . . the imposition of curfews on noisy airports. . . .' " 411 U.S. at 637, 93 S.Ct. at 1861, 36 L.Ed.2d at 555–556 (quoting 118 Cong. Rec. 37317 (1972)) [emphasis added in Supreme Court opinion].

The Court concluded that "[i]t is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption." 411 U.S. at 633, 93 S.Ct. at 1859–1860, 36 L.Ed.2d at 554.

*Harrison,* 319 Md. at 365–68, 572 A.2d 528.

The Court went on to hold that the conditions to "reduce the effect of aircraft engine noise on residential properties" near an airport "trespass upon a field that has been impliedly preempted by federal law." *Id.,* 319 Md. at 362, 572 A.2d 528. Contrary to the Board's position in that case, the Court said that *Burbank* "did not make an exception for small airports that do not involve inter-airport commercial cargo or passenger flights, or for activities not expressly governed by federal statute or regulation." *Id.,* 319 Md. at 369, 572 A.2d 528.

In *Harrison,* Carroll County was seeking to use its police powers to "control noise by regulating the flight of planes."

*Id.,* 319 Md. at 373, 572 A.2d 528. It is that species of regulation that has been preempted by federal law. *See Burbank–Glendale–Pasadena Airport Authority v. Los Angeles,* 979 F.2d 1338 (9th Cir.Cal.1992) (regulation conditioning construction on city approval of placement of runways was pre-empted); *United States v. Berkeley,* 735 F.Supp. 937 (E.D.Mo.1990) (local building code pre-empted when applied to airport); *Blue Sky Entertainment, Inc. v. Town of Gardiner,* 711 F.Supp. 678 (N.D.N.Y.1989) (town law regulating parachute jumping was pre-empted); *Command Helicopters, Inc. v. Chicago,* 691 F.Supp. 1148 (N.D.Ill.1988) (helicopter load limits pre-empted); *Skydive Oregon, Inc. v. Clackamas County,* 122 Or.App. 342, 857 P.2d 879 (1993); *Aero Support Systems, Inc. v. Federal Deposit Ins. Corp.,* 726 F.Supp. 651 (N.D.Tex.1989) (state law concerning recordation of liens on aircraft pre-empted); *Banner Advertising v. City of Boulder,* 868 P.2d 1077 (Colo.1994) (city ordinance prohibiting airplanes from towing advertising banners was pre-empted); *Gary Leasing, Inc. v. Town Bd. of Pendleton,* 127 Misc.2d 194, 485 N.Y.S.2d 693 (N.Y.Sup.Ct.1985) (curfew and limitation on maximum number of planes that could be based at airport preempted); *Pirolo v. Clearwater,* 711 F.2d 1006 (11th Cir. Fla.1983) (curfew and air traffic pattern ordinances preempted); *Northeast Phoenix Homeowners' Ass'n v. Scottsdale Mun. Airport,* 130 Ariz. 487, 636 P.2d 1269 (Ariz.Ct.App.1981) (judicially-imposed curfew preempted).

Although federal law preempts local law in regard to aircraft safety, navigable airspace, and noise control, courts around the country have refrained from applying *Burbank* when land or water use zoning issues are involved. *Gustafson v. City of Lake Angelus,* 76 F.3d 778, 786 (6th Cir.), *cert. denied,* 519 U.S. 823, 117 S.Ct. 81, 136 L.Ed.2d 39 (1996); *see Blue Sky Entertainment, Inc.,* 711 F.Supp. at 683 (FAA stated: "To the extent the ordinance regulates land use in the Town of Gardiner, it is not preempted by federal regulation of aviation"); *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 197 (D.C.Cir.), *cert. denied,* 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991) (FAA stating: "In the present

system of federalism, the FAA does not determine where to build and develop civilian airports, as an owner/operator. Rather, the FAA facilitates airport development by providing Federal financial assistance, and reviews and approves or disapproves revisions to Airport Layout Plans at Federally funded airports.").

In this case, the Board was considering the adverse impact of the proposed facility in regard to the "location of the site," and was presented with conflicting evidence from experts introduced by the parties. Mr. Lamb, introduced by appellant, relied on data based upon the federal "Integrated Noise Model," opining that no matter what noise standard is utilized "the airport has minimal impact on adjacent land use without a detrimental impact. The adjacent land uses are compatible." That testimony was contradicted by Dr. Knoi, who was introduced by the appellees and accepted as an expert in mechanical engineering with a particular reference to fluid dynamics, acoustics, and noise computations. Dr. Knoi attended a noise demonstration at the proposed site and performed his own noise calculations. He utilized "peak" noise levels based upon the standard of the Society of Automotive Engineering Standards, rather than the Federal Aviation Administration's "Integrated Noise Model" or "average" noise level standard pursuant to federal law.[28] His tests recorded noise levels ranging from 74.6 to 97 decibels.

---

**28.** 14 C.F.R. 150.9(b), provides that the "exposure of individuals to noise resulting from the operation of an airport must be established in terms of yearly day-night average sound level (YDNL)[.]" "The day-night average sound level (YDNL) means the 365–day average, in decibels, day-night average sound level. The symbol for YDNL is also Ldn." 14 C.F.R. 150.7. "The yearly day-night average sound level (YDNL) must be employed for the analysis and characterization of multiple aircraft noise events and for determining the cumulative exposure of individuals to noise around airports." 14 C.F.R. A150.3(b). According to 14 C.F.R. A150.101 (Table 1), permissible noise levels at airports are dependent on the land use of adjacent property. For example, a noise level below 65 YDNL decibels is required for airports in residential areas, whereas "[a]gricultural (except livestock) and forestry" permit a level greater than 85 YDNL decibels and "[l]ivestock farming and breeding" permitting noise levels up to 75 YDNL decibels. Maryland law provides that the "noise rating for description of expo-

The Board noted in its opinion that it found Mr. Lamb's testimony to be "academic" and concurred with Dr. Knoi's opinion that the "average" noise analysis was "not appropriate for the analysis of noise at the Helmore Farms facility." The Board based that conclusion on the fact that the "average" noise level analysis was intended for large airports, "such as BWI," rather than airports such as the one proposed at Helmore Farm. Accordingly, based upon the testimony of Dr. Knoi, the Board found "that the impact level of noise at this site was greater than elsewhere in the zone."

We believe the Board erred in using "peak" noise level in its analysis, rather than the "average" noise levels provided by Maryland law, which is not preempted by federal law in regard to land uses. *Gustafson,* 76 F.3d at 786 (6th Cir.1996). Based on our determination that the Board correctly concluded that the proposed use of Helmore Farm was not an airport and that helicopter operations are excluded in the R.C. 2 Zone, however, we need not remand this case to the Board to consider the "average" noise level standard in its impact analysis.

### ii. Thoroughbred Operations

■ Appellant argues that the Board erred as a matter of law in holding that the proposed airport adversely affected local thoroughbred operations. He contends that no evidence existed in the record to support the Board's finding that the thoroughbred operations located in the area would be adversely affected by the operation of the Helmore Farm airport. Appellees argue that the unique nature of the thoroughbred operations in the Greenspring Valley area were cause for the Board's determination.

----

sure to aircraft noise shall be the day-night average sound level (Ldn)[,]" which is defined as "the average sound level, in decibels, reckoned over a 24–hour day with a 10 decibel weighting applied to the noise occurring during the nighttime period; that is, noise levels occurring at night are treated as though they were 10 dB higher than they actually are." COMAR 11.03.03.02B and 11.03.03.01A(5). Similarly, Maryland requires limits, ranging from 65 to 75 Ldn to "no limit," in designated land use areas. COMAR 11.03.03.03.

The Board found that "the impact of the proposed operation [of an airport] would be greater at the subject location than elsewhere in the R.C. 2 zone where the thoroughbred horse industry is less developed and the daily operations as proposed would be of considerably diminished proportion." The Board heard conflicting testimony regarding thoroughbred operations in and around the southern Baltimore County region. The record indicates that the testimony that the Board relied upon, that of Mr. Solomon, included an opinion regarding the future hypothetical use of the Greenspring Valley for thoroughbred operations. Mr. Solomon opined that "there have been horse farms in [the area surrounding Helmore Farm in] the past. There are now, and our position in zoning R.C. 2, was to maintain that use into the future."

Subject to our discussion regarding the relevant neighborhood in D(ii) above, we believe the Board could consider the impact of the proposed use on current and future thoroughbred operations in a properly defined neighborhood. *See Schultz*, 291 Md. at 12–13, 432 A.2d 1319 (quoting *Deen v. Baltimore Gas & Electric Co.*, 240 Md. 317, 330–31, 214 A.2d 146 (1965) (future adverse effects may be considered if supported by evidence on the record)).

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**