*Ray Crawford, et al. v. County Council of Prince George's County, Sitting as the District Council, et al.*, No. 4, September Term 2022. Opinion by Gould, J.

**JUDICIAL REVIEW—LAND USE—PLANNING AND ZONING**

Final decisions of the Prince George's County District Council (the "District Council") are subject to judicial review. Md. Code Ann., Land Use Article § 22-407(a). Here, the final decision under review is the District Council's affirmance of the Prince George's County Planning Board's (the "Planning Board") approval of Amazon's proposed modifications to, and use of, the Property.

The Supreme Court of Maryland applied the holding in *County Council of Prince George's County v. Zimmer Development Co.*: when the District Council reviews a determination by the Planning Board regarding a Specific Design Plan, it considers whether the decision is legally authorized, supported by substantial evidence of record, arbitrary or capricious, or otherwise illegal. 444 Md. 490, 573, 583 (2015).

**AGENCY DEFERENCE—MIXED QUESTIONS OF LAW AND FACT**

Mixed questions of law and fact arise when an agency has correctly stated the law, its fact-finding is supported by the record, and the remaining question is whether the agency has correctly applied the law to the facts. We apply the substantial evidence standard of review to mixed questions of law and fact. Here, there was substantial evidence in the record to support the District Council's affirmance of the Planning Board's conclusion that Amazon's proposed use of a property satisfied the definition of "warehouse" under the Prince George's County zoning ordinance.

Circuit Court for Prince George's County
Case No.: CAL20-18900
Argued: September 13, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 4

September Term, 2022

RAY CRAWFORD, et al.

v.

COUNTY COUNCIL OF PRINCE
GEORGE'S COUNTY, SITTING AS THE
DISTRICT COUNCIL, et al.

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Opinion by Gould, J.

Filed: February 23, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

\* At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

This case requires us to review the approval of certain modifications and improvements to a property owned by Amazon.com Services, LLC ("Amazon") in Prince George's County.[1] The approval was granted by the Planning Board of Prince George's County and affirmed by the County Council of Prince George's County, sitting as the District Council for Prince George's County ("District Council"). Petitioners Ray Crawford, Kathy Crawford, and Charles Reilly (together, "Crawford" or "petitioners") sought judicial review in the Circuit Court for Prince George's County. The circuit court affirmed the District Council's decision, prompting petitioners to file a notice of appeal.

---

[1] The Property is located within the Maryland-Washington Regional District (the "Regional District"). The Regional District includes most of Prince George's and Montgomery Counties, as recognized under the Maryland-Washington Regional District Act (the "RDA"). *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 523-25 (2015); *see* Md. Code Ann., Land Use Article ("LU") § 14-101(l) (2012). As we explained in *Zimmer*:

> The RDA is the essential source of the delegation by the State of zoning authority to Prince George's County for the areas of Prince George's County within the Regional District. The RDA regulates planning and zoning within the Regional District, which includes most of Prince George's and Montgomery Counties. To execute this delegation, the RDA divides broadly authority related to zoning, planning, and other land use matters between the county (district) councils, the Maryland-National Capital Park & Planning Commission, and the county planning boards.

444 Md. at 524-25 (citations omitted).

The RDA established the District Council as a planning and zoning authority for that portion of the Regional District located in Prince George's County. The members of the Prince George's County Council serve as the members of the District Council. LU § 22-101(b).

While the appeal was pending in the Appellate Court of Maryland,[2] petitioners filed a petition for writ of *certiorari*, which we granted. *Crawford v. Cnty. Council of Prince George's Cnty.*, 478 Md. 243 (2022).

The question presented by petitioners, which we have rephrased,[3] is:

> Did the District Council err in affirming the Planning Board's determination that Amazon's proposed use of the property falls within the definition of "Warehouse"[4] under Section 27 of the Prince George's County Code, and is, therefore, permitted by right at the property?

For the reasons explained below, we answer the question in the negative and affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Property*

This dispute concerns a 28.9-acre property located at 1000 Prince George's Boulevard, Upper Marlboro, Prince George's County (the "Property"). The Property is

---

[2] In the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland, and the name of the Court of Appeals to the Supreme Court of Maryland. The name changes took effect on December 14, 2022.

[3] Petitioners framed the issue as: "Whether an Amazon Last Mile Hub is a 'Warehouse' and, therefore, permitted by right at the Subject Property."

[4] We refer to Section 27 of the Prince George's County Code in effect October 2020 when the District Council approved Amazon's application for property improvements as "the Zoning Ordinance" or "PGCC § 27." The definition of "Warehouse Unit" is found in PGCC § 27-107.01(a)(256).

In October 2018, the District Council also enacted a new zoning ordinance (the "New ZO") under Council Bill 013-2018 ("CB-013-2018"), which took effect April 1, 2022.

improved with a 290,225 square-foot building, which includes 38,650 square feet of office space. The Property sits in the 708-acre employment park known as Collington Center. Collington Center is part of a Comprehensive Design Zone ("CDZ") and is zoned as an Employment and Industrial Area ("E-I-A"). Properties in E-I-A zones may be used for "warehouses and distribution facilit[ies]," among other things. PGCC § 27-515(b)(2).

The Property is subject to Comprehensive Design Plan 9006, approved by the Planning Board in November 1990 and subsequently amended ("CDP-9006").[5] The existing building on the Property was constructed pursuant to Specific Design Plan 0007 ("SDP-0007"), approved by the Planning Board in September 2000. In approving SDP-0007, the Planning Board found that the "warehouse [would] be primarily used for storing food products which would be distributed from the warehouse"—a permitted use under CDP-9006. Once completed, the Property was used until 2019 by Distribution Plus Inc. to store and distribute specialty foods.

*Amazon's Purchase of the Property and Proposed Changes*

In 2020, Amazon acquired the Property and proposed to use it as a "last-mile" delivery station. Amazon last-mile delivery stations receive and sort packages around the clock for delivery to customers. Packages are typically held for less than 12 hours at these facilities before being loaded onto delivery vehicles; non-deliverable packages are returned to the facility. Delivery drivers use either company or personal vehicles.

---

[5] The Planning Board approved CDP-8712 for Collington Center in May 1988. In November 1990, the Planning Board approved CDP-9006, which revised CDP-8712. The Planning Board subsequently amended CDP-9006 twice, in ways not relevant here. For simplicity, we refer to CDP-9006, as amended, as CDP-9006.

To put the Property to its proposed use, Amazon sought to increase the paved area for parking, loading, and circulation, and to add an exterior canopy along the eastern portion of the building. These changes required amending SDP-0007 with the approval of the Prince George's County Planning Board ("Planning Board"), under the same process applicable to initial SDP approvals.[6] *See Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 569-70 (2015); PGCC § 27-530. Accordingly, in March 2020, Amazon formally requested approval of amendment SDP-0007-03.[7]

<u>The Planning Board</u>

The Planning Board's authority to deny a Specific Design Plan ("SDP") or amendment thereto is limited. It may do so only if the application does not conform to the applicable Comprehensive Design Plan ("CDP"), zoning requirements, design guidelines and regulations, the Prince George's County Landscape Manual, or other requirements not at issue here.[8] *Zimmer*, 444 Md. at 534-36; PGCC § 27-124.03, 195(a), 521, 528(a)-(c).

---

[6] The Zoning Ordinance requires a property owner seeking to increase paved surface area by more than ten percent to receive approval of an amendment to the applicable SDP from the Planning Board. PGCC § 27-530(a), 27-530(b)(1)(B). Amazon's proposed expansion of the Property's paved area exceeded ten percent, thus necessitating an amendment to SDP-0007.

[7] This was the third proposed amendment to SDP-0007, hence the extension of "03" after "0007." Of the two previously-proposed amendments—SDP-0007-01 and SDP-0007-02—only the former was processed to completion.

[8] *Zimmer* explains that:

The Planning Board must approve an SDP unless the submission fails to: (1) conform to the CDP, the Landscape Manual, or the applicable design guidelines and regulations; (2) demonstrate that the development will be

4

When reviewing an SDP proposal, the Planning Board considers recommendations by technical staff and holds a public hearing. *Zimmer*, 444 Md. at 534. Here, the Planning Board's technical staff evaluated Amazon's application for compliance with E-I-A zoning requirements and the applicable Basic Plans, CDP, and SDP. The staff found the application complied with all requirements, reporting to the Planning Board that: "[t]he existing warehouse and distribution facility, for which the proposed parking and circulation is in support of, is a permitted use in the E-I-A Zone, in accordance with Section 27-515(b)"; "[t]he SDP [amendment] is consistent with the regulations in the E-I-A Zone" regarding purposes, uses, and regulations; "[t]he Basic Plans designate the subject lot for manufacturing/warehouse uses"; "[t]he SDP [amendment] is in conformance with approved CDP-9006"; and the proposed amendment conforms with the existing SDP.[9] The staff recommended approval of Amazon's application.

The Planning Board held a public hearing in July 2020. Petitioners argued that the proposed delivery station would serve as a "[parcel] hub"—not a "warehouse" as defined

served adequately by existing or programmed public facilities within a reasonable time; (3) demonstrate that surface water will be handled adequately; (4) conform with an approved Type 2 Tree Conservation Plan; and, (5) demonstrate that regulated environmental features are preserved and/or restored to the full extent possible. PGCC § 27–528(a). Nonetheless, the Planning Board must still exercise significant agency expertise and judgment in making these determinations.

444 Md. at 535-36.

[9] The applicable Basic Plan for the Property permits "Warehouses and wholesaling establishments," and the applicable CDP permits "manufacturing/warehouse" uses. The most recently approved SDP for the Property permits "Warehousing/Distribution" uses.

in the Zoning Ordinance—and therefore not a permitted use. Petitioners reasoned that the brief storage times of packages, the last-mile delivery model, and the expected volume of vehicle traffic disqualified the proposed use from the definition of "warehouse."

Amazon's counsel contended that the application satisfied the requirements of an SDP under PGCC § 27–528(a). Counsel noted that the Property was previously permitted for warehouse use—which included vehicle traffic on the Property—and emphasized that Amazon's proposed improvements to the Property were modest. Additionally, witnesses for Amazon provided assurances that operations would mitigate traffic impacts.[10]

The Planning Board voted unanimously to adopt the staff report findings and approve Amazon's application to amend the SDP. On July 30, 2020, the Planning Board issued a resolution documenting its findings and approving Amazon's application. The Planning Board found that the application met the requirements of an SDP under PGCC § 27-528(a) and that Amazon's proposed use qualified as a "warehouse and distribution facility" use under PGCC § 27-515.

### *The District Council*

Petitioners appealed the Planning Board's approval of the amendment to the District Council pursuant to PGCC § 27-528.01. Petitioners argued that the Planning Board erred in concluding that the proposed use of the Property qualified as a "warehouse" use under the Zoning Ordinance.

---

[10] Samantha Mazo, witness for Amazon, said: "[Operations are] really designed . . . to accommodate and be as contextual and harmonious with the surrounding neighborhood as is commensurate with an industrially zoned property, and a property that has been used as a warehouse."

6

The District Council subsequently issued a Notice of Final Decision (the "final decision"), announcing its unanimous approval of Amazon's proposed amendment, SDP-0007-03. The District Council concluded that the Planning Board correctly determined that Amazon's proposed use qualified as a "warehouse and distribution facility" use under the Zoning Ordinance's definitions of "warehouse unit" and "distribution facility." PGCC § 27-107.01(a)(256), (66.4).[11]

In so finding, the District Council emphasized certain language from Amazon's description of the proposed use in its Statement of Justification:

> [Amazon] delivery stations receive packages from other Amazon facilities and deliver the packages to the customers. . . . Packages are typically in the delivery station for under 12 hours prior to being loaded onto the DSP[12] vans and Amazon FLEX[13] cars for delivery. . . . Once at the delivery station with their delivery van, DSP drivers load their delivery van and depart to deliver packages directly to customers. . . .
>
> After DSP drivers complete their routes, they return to the delivery station with any packages that may have been non-deliverable. . . .
>
> . . . FLEX drivers only return to the station at the end of the route if any packages were undeliverable.
>
> After departure of the last wave of delivery vehicles, delivery station associates prepare the delivery station for the next day's delivery of packages from the line haul trucks.

---

[11] As to the applicability of the definitions, PGCC § 27-107 provides: "The definitions contained in this Division shall apply to this entire Subtitle [Zoning], and to the wording of any conditions placed on any final decision made in accordance with this Subtitle, such as conditions placed on the approval of zoning cases."

[12] "DSP" stands for "delivery service providers."

[13] "FLEX" is an Amazon service for which delivery drivers use personal vehicles.

7

(Emphasis removed).

The District Council further explained that:

> No different than the specialty food *distribution business* that occupied the building before, Amazon intends to occupy, use, and maintain the *same* ≤300,000-square foot warehouse/distribution <u>building and land</u> for day-to-day operations to receive, store, sort, and deliver or distribute customer orders. Packages and materials will be stored in the building *before* deliveries and *undeliverable* packages will be returned and stored in the building.

### *Judicial Review in the Circuit Court*

Crawford requested judicial review in the Circuit Court for Prince George's County, pursuant to LU § 22-407(a). The circuit court affirmed the District Council's final decision. As noted above, we granted *certiorari* while the appeal was pending in the Appellate Court of Maryland. *Crawford*, 478 Md. 243.

## DISCUSSION

### *Standard of Review*

Final decisions of the District Council are subject to judicial review. LU § 22-407(a).[14] In *County Council of Prince George's County v. Zimmer Development Co.*, 444 Md. 490, this Court addressed the propriety of the District Council's *reversal* of the Planning Board's approval of a certain proposed development. The issues implicated in that case included, among other matters, the source and scope of the Planning Board's statutorily granted authority, the nature and scope of the District Council's role in

---

[14] The District Council may act on a CDP or SDP application at the request of a "person of record" or on the Council's own motion. Otherwise, the Planning Board's decision becomes the final action, reviewable by the circuit court. *Zimmer*, 444 Md. at 574 n.92; *see* PGCC § 27-528.01(a)-(b).

reviewing decisions by the Planning Board, and the appropriate standards for judicial review of the District Council's review of such decisions. *Id.* In *Zimmer*, speaking for the Court, Judge Harrell provided a detailed "introduction to the relevant zoning, planning, and land use regime in play virtually throughout all of Prince George's County (and the Regional District of which it is a part)[.]" *Id*. at 502. Those same concepts are applicable and relevant here. Rather than repeat *Zimmer*'s tutorial, we shall stand on its author's shoulders and assume familiarity with the principles and concepts explained there.

We held in *Zimmer* that the "District Council may reverse an approval by the Planning Board only if the decision was one the Planning Board was not legally authorized to make, is not supported by substantial evidence of record, is arbitrary or capricious, or is otherwise illegal."[15] *Id.* at 583. The appropriate standard to apply depends on whether the question on review is one of law, fact, or mixed law and fact—or, alternatively, if it is committed to agency discretion and expertise.[16]

---

[15] Because the District Council's role in reviewing CDPs and SDPs "mimics the standard of review" applied by the courts to agency decisions, *Zimmer*, 444 Md. at 573, the courts might seem to "look through" the District Council decision directly to the decision of the Planning Board. This interpretation, however, is technically incorrect: the courts may only review final agency action, which, here, is the affirmance by the District Council of the Planning Board's approval of SDP-0007-03.

[16] To provide clarity on the distinctions between these concepts, we offer the following summary:

*First*, we review questions of law, issues "concerning the application or interpretation of the law," *de novo*. *Question of Law*, Black's Law Dictionary (11th ed. 2019); *Comptroller of Maryland v. FC-GEN Operations Inv.'s LLC*, 482 Md. 343, 360 (2022). However, we may give weight to an agency's interpretation of statutes that it administers. *See, e.g.*, *Marzullo v. Kahl*, 366 Md. 158, 172 (2001).

9

Crawford contends that whether the proposed use of the Property is permitted under the Zoning Ordinance is a question of law subject to *de novo* review. We disagree. Questions of law involve only the application or interpretation of law, regardless of the particular facts of a case. *Question of Law*, Black's Law Dictionary; *see Kor-Ko Ltd. v. Maryland Dep't of the Env't*, 451 Md. 401 (2017) (reviewing whether the term "premises" in an environmental regulation includes a surrounding commercial park or is limited to the building that is the source of emissions); *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108 (2001) (reviewing whether guardianship commissions may be deducted as a "personal needs allowance" from a Medical Assistance recipient's available income); *Total*

---

*Second*, we review questions of fact, "determination[s] [by the agency] supported by evidence in the record," under the substantial evidence standard. *Finding of Fact*, Black's Law Dictionary; *FC-GEN Operations Inv.'s*, 482 Md. at 359; *see also* Md. Code Ann., State Gov't Article § 10-222(h)(3)(v) (2021).

*Third*, we review mixed questions of law and fact, "issue[s] that [are] neither a pure question of fact nor a pure question of law," also under the substantial evidence standard. *Mixed Question of Law and Fact*, Black's Law Dictionary; *FC-GEN Operations Inv.'s*, 482 Md. at 363.

*Fourth*, we review agency action on "matters committed to the agency's discretion"—"when an agency acts neither as a finder of fact nor as an interpreter of law but rather in a 'discretionary' capacity," *Spencer v. Maryland State Bd. of Pharmacy*, 380 Md. 515, 528-29 (2004), and where its actions are "specific to its mandate and expertise," *Christopher v. Montgomery Cnty. Dep't of Health & Hum. Servs.*, 381 Md. 188, 199 (2004)—under the arbitrary and capricious standard. *See Zimmer*, 444 Md. at 574.

Examples of matters committed to the agency's discretion include an agency's determination of the appropriate discipline for employee misconduct, *Maryland Transp. Auth. v. King*, 369 Md. 274 (2002); an agency's determination whether to reopen an administrative hearing for additional evidence in a disciplinary matter, *Maryland State Police v. Zeigler*, 330 Md. 540 (1993); and a licensing board's determination whether to refer a member's disciplinary matter to a particular administrative body, *Spencer*, 380 Md. at 518.

10

*Audio-Visual Sys., Inc. v. Dep't of Lab., Licensing & Regul.*, 360 Md. 387 (2000) (reviewing whether an unemployment benefits claimant's departure from an employer for a higher-paying position qualifies as "good cause"). We recently explained:

> The phrase "errors of law" encompasses a variety of legal challenges, including: (1) the constitutionality of an agency's decision; (2) whether the agency had jurisdiction to consider the matter; (3) whether the agency correctly interpreted and applied applicable case law; (4) and whether the agency correctly interpreted an applicable statute or regulation. Although we do not apply any agency deference when undertaking a review of the first three types of legal challenges, we occasionally apply agency deference when reviewing errors of law related to the fourth category.

*FC-GEN Operations Inv.'s*, 482 Md. at 360.

Mixed questions of law and fact, in contrast, arise when an agency has correctly stated the law, its fact-finding is supported by the record, and the remaining question is whether the agency has correctly *applied* the law to the facts. *Charles Cnty. Dep't of Soc. Servs. v. Vann*, 382 Md. 286, 296 (2004). Put another way, mixed questions implicate "*how* an agency applied, as opposed to interpreted, a statute." *Bayly Crossing, LLC v. Consumer Prot. Div., Off. of Att'y Gen.*, 417 Md. 128, 138 (2010) (explaining that "[t]he central dispute, therefore, involves not an interpretation, but 'that last touch of selection' (or discretion), which the agency had to exercise to make the statute meaningful and determinative in a particular case") (citation omitted).

We apply the substantial evidence standard of review to mixed questions of law and fact. Under this standard, our task is "merely to evaluate whether the evidence before the [agency] was 'fairly debatable[.]'" *City of Hyattsville v. Prince George's Cnty. Council*,

11

254 Md. App. 1, 24-25 (2022) (citations omitted); *see also FC-GEN Operations Inv.'s LLC*, 482 Md. at 363.  In *Zimmer*, we elaborated:

> The reviewing court may not substitute its judgment for that of the administrative agency. Rather, the court must affirm the agency decision if there is sufficient evidence such that "a reasoning mind reasonably could have reached the factual conclusion the agency reached."

444 Md. at 573 (citations omitted).

Here, the applicable law is not in dispute; the parties agree that the Zoning Ordinance's definitions of "warehouse unit" and "distribution facility" under PGCC § 27-107.01(a) govern.  Rather, the dispute here is whether, on the specific facts of this case, Amazon's proposed use of the Property qualifies as a warehouse under the Zoning Ordinance.  To this mixed question of law and fact, we apply the substantial evidence standard of review.

## Analysis

We begin by reviewing the permitted uses of the Property.  As noted above, the Property belongs to the larger Collington Center employment park, an E-I-A zone where the property may be used for, "warehouses and distribution facilit[ies]," among other things.  PGCC § 27-515(b)(2).  Thus, use of the property as either a warehouse or a distribution facility would satisfy the ordinance.  We examine both possibilities.

### Warehouse Unit

The Zoning Ordinance provides the following definition of "warehouse unit":

**Warehouse Unit:** A "Building" used for the *storage of goods and materials* in connection with the day-to-day operation of a *wholesale or distribution busines*s, or a business that is not located in the same "Building" or on the

> same property as the "Warehouse Unit." . . . *A "Warehouse Unit" is sometimes referred to as a "Warehouse."*

PGCC § 27-107.01(a)(256) (emphasis added).

To satisfy this definition, two requirements must be met. *First*, the building must be used to store goods and materials. *Second*, the storage of the goods and materials must be in service of the daily operations of either a wholesale or distribution business. Here, because it is undisputed that the building would not be used to support a wholesale business, the issue is whether Amazon's proposed use satisfies the "storage" and "distribution business" requirements. We will discuss each term in turn.

Crawford contends that Amazon's proposed use does not constitute "storage" because Amazon would hold packages at the facility only briefly before dispatching them for delivery. Indeed, packages would typically be held in the facility for under 12 hours. A witness for Crawford—a land planner—argued to the District Council that the proposed use would not be "the standard warehousing and distribution contemplated for Collington Center where products are normally stored on the site in excess of a month." Crawford's understanding of typical storage duration comes from the definition of "Warehousing" under Land Use Code 150 of the Institute of Transportation Engineers Trip Generation Manual—an industry reference guide used, among other purposes, to estimate vehicle trip generation for different land uses. Amazon responds that the Zoning Ordinance does not require packages to be stored for any minimum duration.

Resolving this disagreement requires that we construe the relevant provisions of the Zoning Ordinance. The principles that guide us in this endeavor are the same that apply to

13

our interpretation of statutes. *See Marzullo v. Kahl*, 366 Md. 158, 175-76 (2001). As we have previously explained:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. . . .
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.
>
> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. . . .
>
> In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Lockshin v. Semsker*, 412 Md. 257, 274-76 (2010) (citations omitted).

Notably, the Zoning Ordinance neither defines "storage" nor requires a minimum holding duration. In the absence of statutory definitions, we may consider dictionary definitions to ascertain a word's common understanding. *Berry v. Queen*, 469 Md. 674, 688-90 (2020). Merriam-Webster dictionary defines "storage" as "the act of storing: the state of being stored; *especially*: the safekeeping of goods in a depository (such as a warehouse)[.]" *Storage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/storage (last visited Feb. 10, 2023). The Merriam-Webster dictionary defines the verb "store" as: (1) to "lay away, accumulate"; (2) to "furnish,

14

supply"; (3) to "place or leave in a location (such as a warehouse, library, or computer memory) for preservation or later use or disposal"; and (4) to "provide storage room for: hold."

Applying these definitions to the facts here, the record before both the Planning Board and District Council included Amazon's 13-page Statement of Justification and testimony before the Planning Board by Urban Design Section staff, two Amazon employees, a civil engineer, and a traffic consultant. From our independent review of the record, we have no difficulty concluding that the evidence was sufficient for a reasonable factfinder to conclude that: (1) Amazon would hold packages in the facility prior to being loaded into vehicles for delivery to the consumers; (2) packages would typically remain in the facility for less than 12 hours; (3) packages would be sorted, assigned to different routes, and placed on movable baker's racks in preparation for dispatch to the customers; and (4) non-deliverable packages would be returned to the facility.

Thus, the District Council's finding that Amazon's proposed use constituted "storage" under the Zoning Ordinance was supported by substantial evidence. Under Amazon's proposal, the building would, indeed, be used to "hold" products, however brief that duration might be. At the very least, as observed by the Chair of the Planning Board— and echoed by the People's Zoning Counsel in testimony before the District Council—the

15

matter was "fairly debatable."[17] *See City of Hyattsville*, 254 Md. App. at 24-25. We find no error in this aspect of the District Council's determination.

This brings us to the "distribution business" component of the definition of "warehouse unit." Crawford contends that Amazon's proposed use of the Property would not be in service of the daily operations of a "distribution business." Again, we disagree. For starters, Crawford sidesteps the plain meaning of the term "distribution business." According to the Merriam-Webster dictionary, "distribute," means, in relevant part, "to give out or deliver especially to members of a group." Here, Amazon drivers would use personal and company vehicles to deliver parcels from the Property to individual customers. From the consumer's perspective, that's the *raison d'etre* of Amazon: to *distribute* the product from the retailer or wholesaler directly to the consumer's doorstep. The building would support the distribution function of Amazon's operations.

*Distribution Facility*

Rather than argue over the plain meaning of "distribution business," Crawford focuses on the definition of "distribution facility" under the Zoning Ordinance:

**Distribution Facility:**
(A) A facility to or from which a wholesaler or retailer ships merchandise, materials, or supplies for storage or distribution by that wholesaler or retailer to the sales outlets or service operations it supports; or

---

[17] The People's Zoning Counsel ("Counsel") is a position created in 1970 by the Prince George's County Charter "for the purposes of protecting the public interest and insuring the compilation of a full and complete record." Though the Charter requires Counsel to appear only at zoning hearings, in practice, Counsel appears at hearings regarding land use broadly, including hearings on SDPs. Charter for Prince George's County § 712; *see* PGCC § 27-136; *Zimmer*, 444 Md. at 548 n.57.

16

(B) A business whose functions are similar to those of the United States Postal Service, that is exclusively devoted to the receiving, sorting, sending, and delivery of letters, parcels, and other postal express matter.

PGCC § 27-107.01(a)(66.4).[18]

Crawford argues that part (A) does not apply because "Amazon is shipping products to [the] end-user, not 'sales outlets or service operations it supports.'" Upon careful review of this provision, we disagree with Crawford's interpretation. Breaking down this subsection into its component parts, the "facility" in question is the Property, and Amazon clearly qualifies as a "retailer." Further, Amazon contemplates shipping "merchandise, materials or supplies" both "to" and "from" the Property. As to the purpose for which Amazon ships such merchandise, materials, or supplies, this provision provides two alternatives to qualify as a distribution facility: (1) storage; or (2) distribution to the sales outlets or service operations that Amazon supports.

Substantial evidence in the record supports both alternatives. As noted above, there is no minimum holding period to satisfy the "storage" criteria, and the record evidence supports the conclusion that products would be stored on the Property, as noted above.

---

[18] In 1992, the District Council amended the Zoning Ordinance to "eliminate[] ambiguities and conflicts . . . in the interpretation of Motor Freight Facilities, Trucking Operations, Distribution Facilities, Warehousing and Storage uses" by defining those uses for the first time and amending the use table for Industrial Zones to be consistent with those definitions and reflect how the ordinance had usually been interpreted in the past. Prince George's County Council, CB-90-1992, available at https://princegeorgescountymd.legistar.com/LegislationDetail.aspx?ID=2464339&GUID =67D93228-7893-4164-99CA-510EEF54E71F&Options=ID|Text|&Search=cb-90-1992 [https://perma.cc/39HF-5WM9]. The District Council added the definition of "distribution facility" and amended the definition of "warehouse unit." *Id.*

17

Moreover, the Property would support Amazon's service operations, specifically its delivery services.[19]

*Legislative History*

Citing *Marzullo v. Kahl*, 366 Md. 158, and *Lucas v. People's Counsel for Baltimore City*, 147 Md. App. 209 (2002), Crawford claims support in the legislative history of the relevant Zoning Ordinance provisions. Though legislative history can be useful when interpreting an ordinance, *see, e.g.*, *Berry*, 469 Md. at 702, Crawford fails to establish how the evolution of the Zoning Ordinance culminating in the relevant definitions here supports his position.

Relying on *Lucas*, Crawford argues that the District Council's amendment of the Zoning Ordinance in Council Bill ("CB") 18-2019 to permit the use of certain properties

---

[19] Under the Zoning Ordinance, a "warehouse" and "distribution facility" are each, and independently, permissible uses of the Property. PGCC § 27-515(b)(2). As our discussion above reflects, the definition of "warehouse unit" allows the building to be used for "storage" in service of a "distribution business." We recognize this overlap creates arguable circularity in the definitions of "warehouse unit" and "distribution facility," which complicates any effort to breathe independent meaning and significance into those terms of the Zoning Ordinance—as we strive to do when interpreting legislation. *See Phillips v. State*, 451 Md. 180, 196-97 (2017) (citations omitted) (stating that we read the statute "as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory").

Here, however, as the District Council points out in its brief, the amendments in 1992 that yielded these definitions were intended to codify how the definitions of warehouses and distribution facilities, among other uses, had previously been interpreted by the Planning Board. In the expediency of drafting of these provisions, therefore, redundancy was apparently the price for inclusiveness. That being the case, we will not exalt canons of statutory interpretation over the plain meaning of the words used in these provisions of the Zoning Ordinance, notwithstanding some overlap and redundancy.

18

as "Merchandise Logistics Centers"[20]—a use defined to more closely resemble the last-mile delivery station Amazon proposes here—showed "clear legislative intent that the broader . . . use [(i.e. "warehouse unit" and/or "distribution facility")] no longer included the proposed use."[21]   Although subsequent revisions to statutes may, under certain circumstances, help us determine legislative intent, *see, e.g.*, *Berry*, 469 Md. at 687-88, 702, we are not persuaded that the subsequent text amendments do so here.

Although the District Council *may* have intended CB-18-2019 to permit a new use that *better* described a last-mile delivery facility like that which Amazon proposes here, it does not necessarily follow—and we are not persuaded—that Amazon's proposed use fails to satisfy definitions existing before CB-18-2019's passage.  *See, e.g.*, *Berry*, 469 Md. at

---

[20] CB-18-2019 provided the following definition of a "Merchandise Logistics Center":

> A facility located within a Regional Urban Community, where goods or products are received and may be sorted, packed and stored for the purpose of distribution to parcel carriers or delivery directly to a customer, and which may include ancillary, and related functions such as indoor or outdoor loading and unloading, light maintenance and refueling of fleet vehicles, employee break room(s), ancillary retail sales and customer service areas, pick and pack areas, printing, packaging, and assembling or making products on demand and ancillary and related uses.

CB-18-2019; PGCC § 27-107.01(a)(150.1).   CB-18-2019 was invalidated by the Circuit Court for Prince George's County in February 2020. *Carter v. Prince George's Cnty. Dist. Council*, Case No. CAL19-23357 (Prince George's County Circuit Court Feb. 14, 2020).

[21]   Prince George's County Council, CB-18-2019, available at https://princegeorgescountymd.legistar.com/LegislationDetail.aspx?ID=3930511&GUID =1BB6D883-1856-474F-981C-00855776803F&Options=ID|Text|&Search=cb-18-2019 [https://perma.cc/36PW-KMZJ].

19

702 (concluding that addition of language in statute to expressly cover loss of use damages simply clarified the statute and did not imply that former version of statute excluded loss of use damages). Thus, for our purposes here, we decline to attach significance to CB-18-2019.[22]

*Marzullo* and *Lucas*, more importantly, highlight the deferential nature of the substantial evidence standard of review. In *Marzullo*, the property owner had purchased the subject property to use as his residence. 366 Md. at 161. After moving in, he used part of the home for raising and breeding pythons and boas. *Id.* What began as a hobby turned into a business enterprise of selling boas, in support of which Marzullo sought to construct a separate building on the property. *Id.* at 162. The property was zoned to permit single family detached homes and farms. *Id.* Marzullo contended that his snake breeding qualified as a farm use. *Id.* at 163. The Baltimore County Board of Appeals disagreed, paying heed to the definition's emphasis on the use of the land in connection with the contemplated commercial farming activities and observing that "[t]he subject snakes [were] only outside of the subject building when 'sunning[,]'" were "not dependent on the land," and did not "otherwise use the land, agriculturally, on which the building [was] situated." *Id.* at 168.

---

[22] Crawford makes the same argument with respect to CB-013-2018, passed in October 2018, where the District Council created definitions in the new zoning ordinance for "distribution warehouse," "storage warehouse," and "warehouse storeroom." We are not persuaded that the adoption of the definitions in the new zoning ordinance (which did not take effect until April 1, 2022) is an indication that Amazon's proposed use failed to satisfy the definitions as set forth in the zoning ordinance in effect at the time of the District Council's approval of Amazon's proposed modifications to the Property. In other words, the subsequent enactment of these new definitions does not alter our analysis.

This Court affirmed.  In doing so, we observed that the facts were not disputed, that the Board of Appeals' decision was supported by substantial evidence, and that the Board's interpretation of the relevant zoning provisions accorded with both the legislative history and "common experience and common sense."  *Id*. at 189-91.  We did not, as Crawford urges us to do here, second-guess and overturn the agency's application of the undisputed facts to the relevant provisions of the zoning code.  Our decision in *Marzullo*, therefore, does not help Crawford's cause.

Nor does our decision in *Lucas*, where the question was whether a helicopter landing pad and airstrip on an 87-acre farm qualified for a special exception as an airport under Baltimore County Zoning Regulations. 147 Md. App. at 215-18.  After tracing the historical evolution of the relevant zoning provisions at issue, the ordinance's distinctions between and among various uses (e.g. airports, airstrips, helistops, and helipads), and the statutory scheme, the Appellate Court of Maryland held that the agency's "conclusion that the definition of 'airport' does not include general helicopter operations [was] not wrong, as a matter of law, and was supported by substantial evidence."  *Id*. at 237.  In other words, *Lucas* represents another case in which the court deferred to the agency's determination when supported by the record evidence.

**CONCLUSION**

For the foregoing reasons, we hold that there was substantial evidence in the record to support the District Council's affirmance of the Planning Board's approval of SDP-0007-03.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**